NO. 22-12528

---

**IN THE UNITED STATES DISTRICT COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

**JUDITH COHEN,
*PLAINTIFF-APPELLANT***

*V.*

**ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION
*DEFENDANTS***

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CIVIL DOCKET FOR CASE: 9:20-MD-02924-RLR**

---

**APPELLANT'S OPENING BRIEF**

---

*Judith Cohen, Pro Se
758 Walnut Street
Paramus, NJ 07652
201-447-1337*

{N0510122.1}

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................i

STATEMENT REGARDING ORAL ARGUMENT .................................................ii

STATEMENT ..............................................................................1

NEGOTIATION LITIGATION FUNDING AGREEMENTS ...................................3

COMMON BENEFIT FEES........................................................4

REDUCING THE NUMBER OF PLAINTIFFS IN THE ZANTAC MDL ...............5

CONFLICT OF INTEREST .....................................................9

DUE PROCESS ..............................................................10

CONCLUSION ...............................................................15

 CERTIFICATE OF INTERESTED PARTIES....................................19

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Ethicon, Inc., Pelvic Repair System Products Liability Litigation,*
No. 2:12-md-2327 77 Pretrial Order #4 …………………………………    6, 19

*Gelboimv. Bank of America Corp.,*
No. 13-1174 ………………………………………………………………    6

*Mathews v Elridge,*
No. 424 U.S. 319 (1976) …………………………………………………    13

*Monsanto Company v. Edwin Hardeman*,
No. 21-241 ………………………………………………………………    8, 16

*Ortiz v Fibreboard Corp.,*
527 U.S. 815, 856 (1999) ………………………………………………    5, 18,19

Zantac Litigation,
Case 9:20-md-02924-RLR Document 5849                                             8
Entered on FLSD Docket 07/11/2022 …………………………………


<u>**STATUTES**</u>

32 CFR § 776.26 (a) - Conflict of interest: General rule ……………………    13


<u>**OTHER AUTHORITIES**</u>

Tips For Negotiating Litigation Funding Agreements
By Allen Fagin and Ralph Sutton Law360 April 1, 2022 ……………………    6

Mass Tort Deals: Backroom Bargaining in Multidistrict
Litigation Kindle Edition by Elizabeth Chamblee Burch ……………………    14, 18

2008 Study by the Fred Hutchinson Cancer Research Center ………………    10, 11, 17

Sloan Kettering Study …………………………………………………………    11, 17

Certificate of Interest Party........................................................................

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is not desired.

Re: **Zantac Litigation MDL #2924 LMI#797386**
***Pro Se Submission of Judith Cohen***

**STATEMENT**

This is an Appeal of 2 independent decisions by Judge Rosenberg based upon 2 separate actions of the Court abrogating Plaintiff's rights.

1.    On July 12, 2022, a motion (5854) was submitted requesting that Judge Rosenberg reconsider her denial of the "motion seeks that additional bellwether trials be conducted by cancer type and that breast cancer and other cancers be included is denied because the Court will address Non-Designated Cancers after ruling on the pending Dauber motions for Designated Cancers."

Between the many successful motions to withdraw by Counsel of Record, the cost of filing and pursuing a claim individually including obtaining expert testimony, and the fact that no transcript of the proceeding deciding not to pursue breast cancer (and others) by the PSC exists, it would be **futile** to wait since Judge Rosenberg has no basis/information for making a decision other than to allow individual lawsuits to continue. The cost of the individual lawsuit would exceed any recovery especially if an attorney were retained for this complex litigation.

2.    On July 11, 2022, I received an email from Litigation Management Inc. (zanclaimants@lmiweb.com) stating "you are removed and existed from the Registry as of the date of this email." On July 14, 2022 the Zantac Pro Se Liaison

{N0510122.1}

wrote "the drug manufacturer **defendants** have elected to exit you from the

Registry." Giving the defendant the right to exit a party from the lawsuit is a

denial of due process. The decision to give defendants this right was arbitrary,

capricious, unreasonable and shows that the intent of the Leadership of the MDL is

to get rid of as many litigants as possible. Reducing the number of litigants

increases the likelihood of a settlement. What other reason exists for giving

defendants this right?

This appeal will start with the negotiation for funding the MDL and show in

each process, the intent is to reduce the payout to plaintiffs so that a settlement

occurs with Leadership receiving at least $25,000,000 (estimated), continuing into

choosing the Designated Cancers which proceed and the Non-Designated Cancers

which fall by the wayside. This appeal seeks the following even though the

following quote is from a Class Action. In *Ortiz v Fibreboard Corp*., 527 U.S. 815,

856 (1999) states that "It is obvious after Amchem that a class divided ... requires

division into homogeneous subclasses... with separate representation to eliminate

conflicting interests of counsel. All attorneys representing parties to this litigation,

regardless of their role in the management structure of the litigation and regardless

of this court's designation ... continue to bear the responsibility to represent their

individual client or clients." (77 Pretrial Order #4, *In re: Ethicon, Inc., Pelvic*

*Repair System Products Liability Litigation*, No. 2:12-md-2327).

In *Gelboimv. Bank of America Corp.*, No. 13-1174 the Supreme Court reversed, stressing that cases "Consolidated for MDL pretrial proceedings ordinarily retain their separate identities, so an order disposing of one of the discrete cases in its entirety should qualify under 1291 as an appealable final decision." I received an email on July 11, 2022 stating that "Because you did not file a SFC prior to June 30, 2022, this notice is hereby given that you are removed and exited from the Registry as of the date of this email.

## NEGOTIATION LITIGATION FUNDING AGREEMENTS

In an article, Tips For Negotiating Litigation Funding Agreements By Allen Fagin and Ralph Sutton in Law360 on April 1, 2022, the author provides the following information:

> In the typical single case funding with the client, the funder will provide a fixed dollar commitment for legal fees, constituting a designated percentage of the anticipated fee budget; a fixed dollar commitment for litigation expenses, constituting a designated percentage of the anticipated expense budget; and perhaps an additional amount payable to the client as working capital.

> The funding agreement will specify the percentage of fees to be covered by the funder and by the firm, respectively; there may be room to negotiate these relative percentages depending on a variety of circumstances.

> Typically, the funder's return is based on a multiple of deployed capital, a percentage of total case proceeds or the greater of the two. Because the net return to the funder will vary based on the duration of capital deployment, the multiple or percentage will often increase based on the length of time to case resolution. (A reason to settle quickly)

Similarly, many funding agreements may include an unexpected delay provision, pursuant to which the standard return is increased if the case is not resolved within a designated often lengthy time frame.

Diligence will also include the parties' litigation history and propensity to settle, the skill and experience of counsel, the trier of fact and likely venue, the ability of a defendant to pay a judgment and numerous other factors that may affect likelihood of success, potential damages and ultimate recovery.

It is both useful and appropriate for law firm leaders to view their relationship with funders much as they do their relationship with clients: based on trust and long-term relationships. While a particular funding will last for the life of a case, a truly productive relationship should endure well beyond and across multiple engagements.

This is the first Conflict of Interest whereby the longer the case exists, the higher the cost. What usually happens is that the Leadership reduces the number of Plaintiffs in order to start the process of a settlement.

## COMMON BENEFIT FEES

Another egregious fraud is the failure to disclose "common benefit fees" (based upon Mass Tort Deals probably at least $25,000,000) resulting in a personal gain. "Attorneys do wield their expertise and control to serve their own interests at their clients' expense such as reducing the size of the MDL in order to facilitate a settlement and obtain their 'common benefit fees.' And under the current structure, no one is well situated to police them." The negotiation and/or payment of the "common benefit feed" is a kickback and a fraud upon the litigants especially when it is concealed from the public and not tied to the money received by

Plaintiffs. In order to prevent the litigants from being defrauded, the terms must be publicized and the common benefit fee must be related to the payments to the plaintiff.

## REDUCING THE NUMBER OF PLAINTIFFS IN THE ZANTAC MDL

### A

Normally, a transcript or record exists for the Appeals Panel to review. In this case MDL procedures and the Leadership decided not to have a record despite the fact that scientists can disagree on causation. The Roundup litigation is an excellent example whereby Roundup scientists disputed the relationship between Roundup and Cancer and Plaintiff's scientists supported the relationship between Cancer and Roundup. The Supreme Court in *Monsanto Company v. Edwin Hardeman* 21-241 2022 supported the relationship between Roundup and Cancer. The Non-Designated Cancers will be eliminated in September, 2022 because no information exists to include them.

### B

Document 5849 was filed by attorneys whose client are involved in the litigation.

> ... nothing is more fundamental to due process and the rule of law than the principle that courts will govern litigants by rules that are (1) disclosed to those litigants and (2) laid down in advance.

> ... no member of leadership on either side of the "v" has the power or authority to secretly modify the bargain that was expressly offered to

Movants in PTO 15. And PTO 79 cannot revise PTO 15 to reflect that private, undisclosed agreement years after claimants accepted the bargain it offered. Prior to last week, no objective attorney would or did advise his clients that, under PTO 15, the statute of limitations continued to run through expiration, leaving a short grace period to file a claim once tolling ceased. Yet based on the putative agreement of "Plaintiffs and Brand Defendants," that is precisely the construction this Court gave to the benefit of "tolling," mere weeks before Movants will, on that erroneous construction, be forced to file their claims. PTO 79 ¶ 7. Movants justifiably relied on the truism that tolling means tolling, not grace period. They cannot retroactively have the benefit of their bargain wrenched away because Brand Defendants negotiated a secret definition of a legal term.

Contemporaneously with the filing of PTO 72, Plaintiffs' Senior Leadership entered an agreement with Defendants' Co-Lead Counsel (the "Agreement"). In the Agreement, Plaintiffs' Senior Leadership "agree[d] not to file" more than sixty-five actions in state court, but only "[i]n consideration for the tolling agreements provided by Brand Defendants set forth in paragraph 3 of the agreement]."

Last week the Court issued PTO 79. That order upends the tolling agreement upon which tens of thousands of claimants have relied. The Court titled the Order "Modifications to Registry Timelines" and, in the first paragraph, declared that the Order "modified certain deadlines set forth in Pretrial Order #72 and Pretrial Order #15[.]"

PTO 79 at 1. Paragraph 7 of the Order is most important for this motion:

Tolling Calculation. Pretrial Order # 74 recognized that there are an

increasing number of pro se Registry Participants, who need to determine whether

to remain in the Registry with its tolling or to opt-out and exit the Registry. The

Court therefore takes this opportunity to inform all Registry Participants that the

Plaintiffs and the Brand Defendants have agreed how the tolling provision in

Pretrial Order # 15 applies, as follows:

> While a Registry Participant is (or was) in the Registry, all statutes of limitations applicable to his or her claims continue (or continued) to run. However, if any applicable statute of limitations that was tolled under Pretrial Order # 15 would have expired while the Registry Participant is (or was) in the Registry, then (under Pretrial Order # 15) that statute of limitations does not expire (or did not expire) until 90 days after exit from the Registry. Under this Order, this 90-day period is now changed to 60 days for Registry Participants exited from the Registry on or after July 1, 2022, who allege a Designated Cancer and do not become a Certified Federal Participant

> Movants here are tens of thousands of claimants represented by over a dozen law firms. PTO 79 blindsided every single one of these claimants. The Plaintiff Co-Leads have informed the undersigned counsel that they always intended PTO 15 to only offer a 90-day grace period—and that the Plaintiff Co-Leads communicated this understanding to Defendants and to the Court in private discussions (There never seems to be a record for important matters.)

C

Previously removed by an arbitrary and capricious determination by

Leadership was the evidence in the Breast Cancer complaint. In 2008 the Fred

Hutchinson Cancer Research Center "discovered that the link between ranitidine

and breast cancer was significant" after being peer reviewed. In fact, the use of

ranitidine increased the risk of (breast cancer) ductal carcinoma by 220% and of

estrogen receptor-positive/progesterone receptor-positive ductal carcinoma by

240%." Sloan Kettering in a study in 2021 found a similar relationship between

ductal carcinoma and ranitidine as well. There is at least 1 breast cancer case that is about ready to go to trial in state court.

Generic Brands were removed from the litigation because their label and formula followed the name brand. Between 2004-2017 Pfizer receives FDA approval for an over-the-counter version of Zantac in the U.S., and the brand later moved in various transactions to Johnson & Johnson, Boehringer Ingelheim Pharmaceuticals and Sanofi SA, which currently sells Zantac in the U.S.

When any brand is purchased, due diligence is performed not only on the financial end but also on the scientific end. When Fred Hutchinson Cancer Research Center published its peer review finding in 2008, the various companies should have discovered this and reported this to the FDA.

No investigation was performed to determine if the various companies had knowledge of this relationship and their obligation to bring this to the attention of the FDA. The leadership avoided this issue by dropping breast cancer.

While the above is a supposition on my part, the writing on the label that Boehringer Ingelheim, for example, submitted to the FDA dated September 2015 under "other information" states "Avoid excessive heat or humidity," and "store at 20-25C (68-77F). Whether the company followed this mandate and avoided having unrefrigerated tractor trailers transporting the pills during the hot summer months

where the temperature in a trailing could be over 100 degrees needs to be investigated in order to determine if the Company followed the label's instructions.

Judge Rosenberg had no information about the whether the generic companies including Boehringer Ingelheim, followed the label to "avoid excessive heat or humidity" when storing and shipping Zantac in order to insure the safe handling of Zantac when she issued her ruling that Generic Companies were not liable since they followed the approved wording on the label,

D

The Court stated that it will address Non-Designated Cancers (such as breast cancer) after ruling on the pending Daubert motions for Designated cancers. In the interim, in a letter from the Zantac Pro See Liaison, "The drug manufacturer **Defendants** have elected to exit you from the Registry." Between this, the many successful motions to withdraw by Counsel of Record, the cost of filing and pursuing a claim and the fact that no transcript of a proceeding deciding not to pursue breast cancer by the PSC exists, it would be **futile** to wait since Judge Rosenberg has no basis/information for making a decision In addition, I received an email on July 12, 2022 stating that "Because you did not file a SFC prior to June 30, 2022, this notice is hereby given that you are removed and exited from the Registry as of the date of this email."

**<u>CONFLICT OF INTEREST</u>**

The Hearings or Meetings (if there were any) that eliminated breast cancer created a conflict of interest for those attorneys involved in the decision. Most attorneys are representing cancers that remained in the MDL as well as those currently excluded from the MDL such as breast cancer. If they challenged a cancer that their client had even if the association were weak, this would be a conflict of interest since "the representation of one client will be directly adverse to another client, and representing the current class in the MDL materially limited the lawyer's responsibilities to another client" CFR § 776.26 Conflict of interest: General rule.

> (a)    Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> > (1)    the representation of one client will be directly adverse to another client; or
> >
> > (2)    there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, ... or by a personal interest of the lawyer.

## DUE PROCESS

In the Mathews-Doehr Test, the Supreme Court in *Mathews v Elridge*, 424 U.S. 319 (1976), considered what process was due process. "Due process is flexible and calls for such procedural protections as the particular situation demands." An examination of "fairness and reliability of the pre deprivation process should be performed and the risk of error inherent in the truth finding

process." Here, no information is available (no transcript or record) on how the leadership determined which cancers should be included and which cancers should be excluded The "day in court" never occurred.

1.      See:  REDUCING THE NUMBER OF PLAINTIFFS IN THE ZANTAC MDL

2.      It is my understanding that "Defendants have elected to exit you from the Registry," How can the adverse party do this?

3.      The information below from an article by Elizabeth Chamblee Burch "Does Multidistrict Litigation Deny Plaintiffs Due Process" in Law360 on June 9, 2019, will be used to show "Its leaders announced that they were creating a template for all future deals — and they did. Every subsequent settlement I examined replicated and refined its cramdown mechanisms.

> Repeat players consistently occupy lucrative leadership positions is no surprise, given the factors that judges appoint them. Evidence suggests the deals they make are often riddled with self-interest, and laced with provisions that goad plaintiffs into consenting.

> Repeat players play the long game — which means that they can develop working relationships with their opponents, such that each side can use private settlement to bargain for what matters to them most from a self-interested standpoint. Corporate defendants and their lawyers want to end lawsuits with the least cost. And lead plaintiffs lawyers profit substantially from attorneys' fees — specifically common-benefit fees (the money they receive for the work they do on the whole group's behalf).

> In all but one of the private settlements I examined, plaintiffs' leadership used their deal making authority to increase their common-

benefit fees. Every deal likewise contained at least one settlement provision designed to strong-arm plaintiffs into settling, thereby ending the suits for defendants.

It also severs the contingent-fee link that intertwines the fates of lawyers and clients. That uncoupling can cause mischief.

Take the lawsuits over the acid-reflux medicine Propulsid, for instance. The lead plaintiffs' lawyers in Propulsid (two of whom are also leaders in the opioid MDL — Peter Mougey and Chris Seeger) negotiated their common-benefit fees directly with the defendant, Johnson & Johnson (also a defendant in the opioid MDL).

Johnson & Johnson paid plaintiffs' leaders $27 million in common-benefit fees.  But out of the 6,012 claimants who entered into the settlement program, only 37 received any money. Collectively, those claimants recovered little more than $6.5 million. Much of the remaining money in the settlement fund then reverted back to Johnson & Johnson.

Propulsid's lead plaintiffs' lawyer Russ Herman said, "Johnson & Johnson's express wish was to have all cases resolved. ... One of the issues was that Johnson & Johnson insisted that unused funds would have 100% reversion to J&J." Consequently, he continued, "the [plaintiffs steering committee] and the state liaison folks who negotiated Propulsid II insisted that ... J&J should pay [them] a reasonable attorney's fee, which was agreed to."[2] The deal was, in Herman's words, a "quid pro quo."

Propulsid's not a one-off. Its leaders announced that they were creating a template for all future deals — and they did. (Here, Cancers were excluded with no hearing and no record).

Most mass-tort MDLs conclude in private settlements. Are disgruntled lawyers to object to the same leaders who refused to grant them access to discovery and settlement negotiations? To the judge?

Judges are pro-settlement. Judge Dan Polster, who presides over the Opioid MDL, made it clear in his first hearing that he wanted a settlement by the year's end. He took a similar stance when he presided over the Gadolinium-Based Contrast Agents proceeding a few years

earlier: "[T]he cases should be settled, all right? ...  They can be settled and they should be settled," he declared.

The judges who preside over products liability proceedings nudge plaintiffs into private settlements in many different ways: The panel denied Bickford's request for a separate MDL. As a judge on the panel concluded at the end of Bickford's hearing: "There is no authority for the due process argument."

3.      The Roundup Case, *Monsanto Company v. Edwin Hardeman,* No. 21-241 is instructional about <u>expert testimony</u>. Bayer was able to find scientists willing to testify that Roundup did not cause cancer. Bayer has argued that the cancer claims over Roundup and glyphosate go against sound science and product clearance from the EPA that determined that glyphosate (the ingredient in Roundup) was safe in 2020. The U.S. Supreme Court on June 1, 2022 rejected Bayer's bid to dismiss legal claims that Roundup does not cause cancer. In addition, the 11th Circuit ordered the EPA to reconsider its decision that Roundup did not cause cancer. What the above paragraph shows is that science is not exact and that different scientists have different beliefs. There is at least 1 breast cancer case that is about ready to go to trial in state court. Has anybody looked at the evidence in this and other breast cancer cases? The answer is "No" because this might increase the size of the MDL.

4.      Judge Rosenberg removed Generic Drug Manufacturers from the MDL because "Federal law doesn't permit a generic drug company to change either the design of its drug or the warning, and therefore not liable." Previously

removed by an arbitrary and capricious determination by Leadership was the evidence in the Breast Cancer complaint. In 2008 the Fred Hutchinson Cancer Research Center "discovered that the link between ranitidine and breast cancer was significant after being peer reviewed. In fact, the use of ranitidine increased the risk of (breast cancer) ductal carcinoma by 220% and estrogen receptor-positive/progesterone receptor-positive ductal carcinoma by 240%. Sloan Kettering in a recent study found a similar relationships between ductal carcinoma and ranitidine as well. The generic drug company investigated ranitidine before producing the medication. No investigation was performed to ascertain whether they had knowledge of the above study. If they did and failed disclose this information to the FDA, the generic manufacturers could be liable.

5.    Judicially appointed lead lawyers often hold their post in numerous MDL's filed over the years . This "old boy" network, which is an informal system in which wealthy men/women with similar social or educational background help each other in business or personal matters. Many lawyers attempt to join this club by "keeping quiet" when transgressions occur. Leaders should not be allowed to backdoor trades with the defendant into a settlement (as J&J did). According to Elizabeth Chamblee Burch, "Each new deal provides high-level repeat players on both sides an opportunity to tweak their strategy. They'll cast a broader participation net or invent new bait to induce plaintiff to settle. Other times, the

change will push the ethical boundaries just a little further. The next one will do the same and so on. Ethics slip away one deal at a time."

The Leadership has a fiduciary responsibility to the litigants which has been violated by the Leadership. More specifically, Leadership intentionally avoided the use of written documents and recordings when excluding certain cancers (Non-Designated)in order to manipulate a settlement, avoid a challenge to their decision, and exclude "tens of thousands of claimants represented by over a dozen law firms (with certain cancers)."

<u>**CONCLUSION**</u>

In Amchem, the Supreme Court explained quoting *Ortiz v Fibreboard Corp*., 527 U.S. 815, 856 (1999) that "in significant respects, the interest of those within the single class are not aligned. ... In short, the settling parties achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected.  As Elizabeth Cabraser and Professor Samuel Issacharoff argue "Independent groups of counsel provide a more engaged form of class counsel monitoring than either court oversight or unrepresented class members making a yes or no decision on a settlement offer."

"All attorneys representing parties to this litigation, regardless of their role in the management structure of the litigation and regardless of this court's designation of Lead and Liaison Counsel, a Plaintiff's Executive committee and a

Plaintiff's Steering Committee, continue to bear the responsibility to represent their individual client or clients." (77 Pretrial Order #4, In re: *Ethicon, Inc., Pelvic Repair System Products Liability Litigation*, No. 2:12-md-2327). *Ortiz v Fibreboard Corp.,* 527 U.S. 815, 856 (1999) states that "It is obvious after Amchem that a class divided ... requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel."

Rule 23, even though it is for class actions, makes much more sense and defends the rights of the litigants as opposed to having them trampled by Leadership:

    a.    One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

        (1)    the class is so numerous that joinder of all members is impracticable;

        (2)    there are questions of law or fact common to the class;

        (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

        (4)    the representative parties will fairly and adequately protect the interests of the class.

For the above reasons, I am requesting that addition bellwether trials be conducted by cancer type and that breast cancer and other cancers be included.

Dated: September 23, 2022

Respectfully submitted,

Judith Cohen *Pro Se*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

**Type-Volume Limit, Typeface Requirements, and Type-Style Requirements**

I hereby certify that:

1. This document complies with the word limited of Fed. R. App. P. Local Rule 32.1(a)(4)(A) because, excluding those parts of this document exempted by Fed. R. App. P. 32(f), this document contains 4,076 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size in Times New Roman.

Dated:        New York, New York
              September 19, 2022

_/s/ Judith Cohen, Pro Se_

**U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT (CIP)**

Judith Cohen  *vs.*  9:20-md-02924-RLR (Zantac)  Appeal No. 22-12528

11th Cir. R. 26.1-1(a) (enclosed) requires the appellant or petitioner to file a Certificate of Interested Persons and Corporate Disclosure Statement (CIP) with this court within 14 days after the date the case or appeal is docketed in this court, and to include a CIP within every motion, petition, brief, answer, response, and reply filed.  Also, all appellees, intervenors, respondents, and all other parties to the case or appeal must file a CIP within 28 days after the date the case or appeal is docketed in this court.  **You may use this form to fulfill these requirements.**  In alphabetical order, with one name per line, please list all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

*(please type or print legibly)*:

Cohen Raymond

Rosenberg Judge Robin

Sanofi SA (Symbol SNY)

Zantac Litigation, Leadership